IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,214






REGINALD BLANTON, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM BEXAR COUNTY





 

 PRICE, J., delivered the opinion for a unanimous Court.


O P I N I O N



 A Bexar County jury convicted the appellant, Reginald Blanton, of killing Carlos
Garza while in the course of robbing him or burglarizing his home. (1) Pursuant to the jury's
answers to the special issues set forth in Texas Code of Criminal Procedure Article
37.071, Sections 2(b) and 2(e), the trial judge sentenced the appellant to death. (2) Direct
appeal to this Court is automatic. The appellant raises six points of error challenging his
conviction and sentence. He claims that the evidence is legally and factually insufficient. 
He also claims that the trial court erred in (1) overruling his Batson (3) objections, (2) failing
to include lesser-included offense instructions in the jury charge, (3) allowing the State to
improperly impeach two witnesses, and (4) overruling the appellant's objection to the
State's argument that attacked the appellant over the shoulders of counsel. We reject each
of his contentions and affirm the trial court's judgment. 

I. Facts


 The evidence at trial showed that Garza was murdered at his residence in the
Stepping Stone Apartments in San Antonio, Texas, on April 9, 2000. Patricia Romano, who
lived across the hall from Garza, testified that she heard a loud banging noise about three or
four weeks prior to the murder. She went outside on her balcony and saw the appellant
banging on Garza's door. When she told the appellant that Garza was obviously not coming
to the door, the appellant angrily replied, "Shut up, bitch, get back in your house."

 On the day that Garza was killed, Romano returned to the apartment complex after
running an errand with her daughter and saw Garza sitting with a young Hispanic girl at a
picnic table near the pool. She went inside her apartment and when she came back outside
about an hour later, Garza and the girl were gone. Romano was picking up trash near the
laundry room when a Hispanic man named Ralph Vidal and an African-American man named
Joseph Anderson approached her. Vidal asked her if she had seen Garza and she replied that
she had seen him earlier. Vidal told her that, when they returned from the store, they
noticed that Garza's door was open and that frame was splintered. He thought someone
might have broken into Garza's apartment, and he asked Romano to call the police. 

 Romano went upstairs to take a closer look at the door. She saw that the lock was
engaged and the door frame was splintered as though it had been kicked open. The stereo
blared, and all of the cushions had been pulled off the couch in the living room as if
someone had ransacked the apartment. She went to her apartment and called the apartment
manager, who told her to call the police. The apartment manager arrived about fifteen
minutes later and went into the entryway of Garza's apartment with Romano's husband. 
From there, they saw a body lying on the floor. Romano's husband believed that it was
Garza, and he saw that part of his leg was still moving.

 Ernest Borroel, Jr., lived in the apartment beneath Garza's apartment. At around
5:00 or 5:30 p.m. on the day of the murder Borroel heard a noise as if something had fallen
or had been tipped over upstairs in Garza's apartment. 

 When San Antonio Police Department (SAPD) Officer Richard Odoms arrived at
Garza's apartment, he saw that the door jamb was destroyed, the door frame was lying on
the floor, the dead bolt was sticking out, and there was a footprint on the door as if
someone had kicked it in. Odoms saw Garza lying unconscious in the hallway with what
looked like a bullet wound to his forehead. Odoms heard Garza make a "gurgling type
sound," like "somebody snoring." He saw two spent bullet casings on the floor: one by
Garza's feet and another by his head. Garza's stereo was blaring and a pager kept going off.

 Paramedic Michael Rodriguez arrived at Garza's apartment at about 6:30 p.m. He
saw that Garza was bleeding from two gunshot wounds to his face. He noticed that Garza
was still breathing and had a pulse. Garza's breathing was irregular, and he made a
"gurgling" sound. His pulse stopped on the way to the hospital. Bexar County Chief
Medical Examiner Robert Bux testified that Garza suffered two gunshot wounds to his
head, one to the left front scalp area and one to his cheek. The gunshot wound to his scalp
was fatal.

 Two days later, SAPD Officer Ricky Lopez and his partner were dispatched to the
appellant's father's home on a disturbance call. The appellant's twin brother, Robert
Blanton, and Blanton's girlfriend, LaToya Mayberry, (4) were arguing outside. Mayberry
initially gave Lopez a false name, but her brother told the officer her real name. Lopez
discovered that Mayberry had active municipal court warrants. Lopez's partner placed
Mayberry under arrest. Lopez's partner then placed Mayberry in handcuffs and put her into
the patrol car. 

 While Mayberry sat in the patrol car, she told Lopez that she had information about a
murder that had occurred a few days before at the Stepping Stone Apartments. She also told
Detective Rocky Dyer that the appellant and Blanton were involved in the homicide, that
she heard the appellant brag about it, and that they went back to the scene shortly after the
shooting. Mayberry was transported to the police station for formal questioning.

 Detective Raymond Roberts interviewed Mayberry and took her statement. Roberts
testified that he told Mayberry that she did not have to talk about the murder. She said she
wanted to tell him what happened because it was upsetting her. He explained Mayberry's
rights to her before the interview began, and she indicated that she understood her rights. 
He never threatened her or told her that she would be arrested for capital murder if she did
not give a statement. 

 In her statement, Mayberry said that Blanton drove the appellant in her
grandmother's car to the Stepping Stone Apartments, where Garza lived. She went along
with the brothers. They went to the third floor and knocked on the door of Garza's
apartment. No one answered the door, and Blanton told Mayberry to go back downstairs
and wait in the car. She heard Blanton tell the appellant, "Let's go," and when she heard the
appellant say, "No[,] cuz, don't go," she knew that "something was going to go down." She
believed that Blanton stayed with the appellant because he was scared of him. 

 While Mayberry was sitting in the car, she heard "two loud booms," and she "knew
that it had to be them kicking in the door to Garza's apartment." She heard "two more
booms." She said that she knew right away that they were gunshots because she had heard
gunshots before. She then saw Blanton running toward the car, and his eyes "were real big
like he was scared." He was "breathing real fast and hard" and got into the car and started
the engine. He did not answer her when she asked him what happened. The appellant
jumped in the car as Blanton was driving away. In his hands, the appellant had a small blue
box and some jewelry, including a gold herringbone necklace and a broken gold rope
necklace. The appellant was also wearing a gold lion's-head ring with two ruby eyes and a
diamond in its mouth that Mayberry had not seen before. 

 As they were leaving, the appellant took a silver gun out of his pocket and told
Mayberry that it was a ".380." He also said, "Fuck, I left a bullet in the house," and told
Blanton he wanted to go back to the apartment so he could get his "dope." Blanton refused
to drive back. Instead, Blanton drove them to a friend's apartment where they stayed for
about twenty minutes. 

 Blanton then drove them back to the Stepping Stone Apartments. Blanton and
Mayberry waited in the car while the appellant went inside. When the appellant came back
he was laughing and said, "That mother fucker's in there snoring, I thought I was going to
have to do that mother fucker again." The appellant also said he "turned everything over in
the apartment" and took one hundred dollars.

 The appellant then made Blanton drive to a pawn shop. On the way there, the
appellant asked Mayberry if she thought the rubies in the lion's-head ring were real. They
arrived at the pawn shop at about 5:50 p.m. The appellant pawned the two necklaces and a
"Jesus charm." 

 After they left the pawn shop, Blanton drove them to Adkins, Texas. While they
were riding in the car, the appellant was laughing and bragging about shooting Garza. He
said, "I peeled that mother fucker's head back, you see how he just dropped in the corner." 
He said that he kicked in the door and that it looked like Garza had just gotten out of the
shower. When Garza asked the appellant what was going on, he told Garza to "brake
himself," which means "It's a robbery, give me all your shit." When Garza said, "No," the
appellant shot him. When Garza fell down, the appellant shot him again in the head.

 Blanton drove the appellant back to his girlfriend's apartment at about 8:00 or 8:30
p.m. Mayberry and Blanton went to get something to eat and then returned home about
9:30 p.m. They heard about a burglary and murder that night on the news. Mayberry asked
Blanton what had happened. Blanton told her that the door was kicked in, Garza came
around the corner and asked what they were doing, and the appellant shot him. He said that
the appellant looked around the apartment for drugs, but could not find any. Then he shot
Garza again. Blanton said that "[Garza] was just laying there snoring." After Roberts typed
Mayberry's statement, he gave her an opportunity to read it and make corrections. She
indicated that she was satisfied with her statement and signed it in front of two witnesses. 

 After Mayberry signed her statement, she and Roberts called Blanton. Roberts
asked him to come down to the station to talk to them and that he was not under arrest. 
Blanton was reluctant to speak with Roberts at first. After viewing Garza's autopsy
photographs and talking to Mayberry alone for a few minutes, however, Blanton gave a
statement. 

 In his statement, Blanton said that he drove the appellant and Mayberry to Garza's
apartment complex. They knocked on the door, and when no one answered, he and
Mayberry started to leave. The appellant told him to stay. Mayberry went back to the car. 
He sat down on the steps while the appellant continued to knock on the door. Then he heard
a loud noise "like somebody hit something pretty hard." He followed the appellant into the
apartment and heard the appellant and Garza arguing in the back room. He heard a gunshot
and ran out of the apartment. As he was running down the stairs, he heard another gunshot. 
He got into the car with Mayberry, then the appellant came walking out of the complex and
got into the car. Blanton asked the appellant what happened, and he replied, "Don't worry
about it." 

 From there, Blanton drove to the appellant's apartment, and they stayed there for
about five minutes. Blanton then drove them to the apartment complex next door to the
Stepping Stone Apartments and parked the car. The appellant walked back to the Stepping
Stone Apartments and returned to the car about five minutes later. 

 Blanton drove them to a pawn shop, where Blanton and Mayberry stayed in the car
while the appellant went inside. (5) When he got back into the car, the appellant said that he
had pawned his jewelry. Blanton drove the appellant back to his apartment, and then Blanton
and Mayberry returned home. Blanton found out from the Sunday night news that Garza was
dead. He never saw the appellant with a gun, and he did not know what he did with the gun.

 After he completed his statement, Roberts gave Blanton an opportunity to review it. 
Blanton reviewed the statement and signed it.

 During the trial, Mayberry testified that the statement that she made to the police
was not true. She denied that she approached police with information about a capital
murder. She testified that she gave her statement because the police accused her of being
in the apartment, stated that they had witnesses implicating her and Blanton, and told her
that she would be charged with capital murder if she did not give a statement. When asked
about the first two "loud booms" she said she heard while waiting in the car, she denied
knowing that it was Blanton and the appellant kicking in the door to Garza's apartment. She
testified that children were outside playing with rocks and sticks, and she said that all the
noises sounded the same. When asked about the second set of "booms" that she heard, she
testified that she did not know if they were gunshots because she had heard gunshots before
only on television. She denied telling police that Blanton stayed upstairs with the appellant
because he was scared of him. She denied saying that Blanton's eyes were big and that he
appeared to be afraid when he returned to the car. On the first day of her trial testimony,
Mayberry stated that when they left the apartment complex she saw that the appellant had
something "shiny" that looked like a gun, and that she asked him what it was and he told her
it was either a ".380" or a ".38." On the second day of her trial testimony, she stated that
she never saw the appellant with a gun and that she lied the day before when she testified
that she had. 

 Mayberry also denied telling police that the appellant said that he "left a bullet in the
house." She denied that the appellant wanted to go back to Garza's apartment to get some
"dope," that the appellant said he "turned everything over in the apartment" and took one
hundred dollars, and that the appellant stated, "I thought I was going to have to do that
mother fucker again." She denied that the appellant was laughing and bragging about
shooting Garza and that he said, "I peeled that mother fucker's head back."

 Mayberry clarified at trial that the appellant had been wearing a gold religious
pendant in addition to the lion's-head ring, a gold herringbone necklace, and a gold "broke
rope" necklace. She said that the appellant often carried a blue box in which he kept his
pencils. She also testified at trial that when they left the Stepping Stone Apartments the
first time, she noticed a black male and a Hispanic male walking down the street towards
the grocery store. When they later returned to the Stepping Stone, she noticed the same
two men walking back from the store. 

 Blanton denied certain portions of his statement when he testified during the
appellant's trial. He confirmed that they went to Garza's apartment and to the pawn shop,
but he said, "The part that's not correct is when they interject things about [Garza's] death." 
He testified that he told Mayberry to go back to the car because it was hot outside and she
"had a little attitude," and said that he and the appellant came down to the car at the same
time about a minute later. He denied seeing the appellant enter the apartment and hearing
gunshots. He confirmed that the appellant later returned to Garza's apartment and came
back to the car about five minutes later, but testified that the appellant told them when he
returned to the car that Garza was still not home. He denied telling police that he found out
that Garza was dead when he watched the Sunday night news. He testified that the only
reason he signed the statement was so that the police would let him and Mayberry go home.

 Blanton also testified that he never saw a blue box in the appellant's hands. He had
seen the appellant wearing a gold lion's-head ring prior to the day of the murder. He did not
see the jewelry that the appellant intended to pawn until they arrived at the pawn shop. He
thought that the appellant must have had the jewelry in his pocket.

 Garza's girlfriend Debra Estrada testified that she was with him at the apartment
complex on the day of the murder. Estrada saw Garza wearing a gold chain with a religious
pendant, a couple of rings including a lion ring with ruby eyes, and a gold nugget bracelet. 
She identified these items as the same items that the police had obtained from the pawn
shop where the appellant pawned jewelry after the killing. 

 Estrada testified that, on the afternoon of the murder, she and Garza had been sitting
outside at a picnic table waiting for her friends to pick her up when an African-American
man later identified as Anderson and a Hispanic man later identified as Vidal came by to
talk to Garza. Garza told them about an incident the day before when he pulled a knife on
someone at the Poteet Strawberry Festival. Anderson asked Garza what he would do if
someone ever pulled a gun on him. The men were teasing each other at first, but then
Anderson started getting aggravated with Garza and looked like he was going to take a swing
at him. The men talked about getting together later to smoke marijuana. Then she and
Garza got up from the table and left. Garza went to the laundry room, and Estrada left the
apartment complex when her friend arrived to pick her up.

 Vidal and Anderson testified that they had talked with Garza and his girlfriend at the
picnic table that afternoon. They had agreed to meet up with Garza later to smoke
marijuana. Garza said he was going up to his apartment to change clothes, and Vidal and
Anderson walked to the store to buy cigars and beer. 

 When they returned, they saw from their position downstairs that Garza's door was
slightly open. They whistled for Garza to come downstairs, but he did not respond. Vidal
walked back a bit so he could get a better view of the door, and he saw the dead bolts
sticking out and broken wood. They went to Vidal's apartment where Vidal paged Garza. 
Garza did not call, however. 

 They went back outside, saw Romano picking up trash, and asked her to take a look
inside Garza's apartment.

 Vidal further testified that he had seen Garza wearing a necklace with a religious
pendant many times. He also testified that the appellant used to hang out at the apartment
complex with Garza and other friends. Two or three weeks prior to the murder, Garza had
flaunted his money in front of the appellant and his brother. The appellant had said, "You
keep pulling out money, somebody's going to jack you."

 Garza's wife, Yvonne, from whom he had been separated, testified that the last time
she saw Garza was on April 6, 2000, when he came to her apartment to visit their son. He
had called her on April 9 at 2:00 a.m. and said he was coming to visit their son that day. She
paged him around 4:45 or 5:00 p.m., and he did not return her page. He never showed up,
and a friend who came to her home on Sunday evening told her that he had been killed. 

 Yvonne testified that she bought and gave Garza a ten-karat gold nugget bracelet
from Treasures jewelry store on February 3, 2000. She also bought Garza a herringbone
chain from Piercing Pagoda on February 3. On February 16, she bought and gave Garza a
ten-karat gold lion ring. She testified that Garza often wore a Jesus and Mary pendant on a
gold rope chain that was broken and held together with wire.

 Yvonne also testified that Garza had a lockbox in his apartment where he kept items
of value. About a week after Garza's death, she cleaned out his apartment and noticed that
the lock was missing from the lockbox. The gold rope necklace with the religious pendant,
the herringbone necklace, the lion's-head ring, and the nugget bracelet were also missing
from the apartment. Garza was wearing all of this jewelry, except for the herringbone
chain, when she last saw him on April 6. She testified that she had never known Garza to
lend his jewelry to friends. However, upon viewing photographs of the appellant, Garza, and
other friends taken prior to Garza's death, she acknowledged that the appellant was wearing
jewelry similar to Garza's religious pendant and gold nugget bracelet. 

 Henry Esparza, Jr., an employee at Hollywood Video, testified that movies were
rented on Blanton's account at 4:43 p.m. on April 9, 2000. Brian Collins, the assistant
manager at EZ Pawn, testified that the appellant pawned a gold herringbone chain, a gold
rope necklace with a broken chain, and a religious pendant for eighty-five dollars at 6:00
p.m. on April 9. Collins noticed that the appellant was wearing a lion's-head ring with
rubies in its eyes and a diamond in its mouth, but he did not pawn it. While the appellant
was inside the store, Collins observed a black man and a black woman outside the shop. The
woman seemed upset and was pacing back and forth and the man was talking to her and
trying to calm her down. At trial, Mayberry denied that she was upset while waiting outside
the pawn shop.

 Alkeshia Hoyle testified that she and the appellant were living together at the time of
the offense. The appellant's brother and his brother's girlfriend were coming to visit him
when she left the apartment on April 9. The appellant paged her from their apartment
sometime between 6:00 p.m. and 7:00 p.m. He was at the apartment when she arrived home
at about 10:00 p.m. She observed him wearing a gold nugget bracelet and an "animal ring"
with red rubies that she had not seen him wearing before. When the appellant was arrested
at their apartment on April 13, he was wearing a gold nugget bracelet and a lion's-head ring
with ruby eyes and a diamond in its mouth. 

 The State introduced several jewelry receipts at trial, including a receipt from
Piercing Pagoda for a twenty-two-inch gold rope chain; a layaway pick-up receipt from
Piercing Pagoda for a gold herringbone necklace dated February 3, 2000; a receipt from
Treasures for a ten-karat gold nugget bracelet dated February 3, 2000, under the customer
name "Yvonne;" and another receipt from Treasures for a ten-karat gold lion ring dated
February 16, 2000, also under the customer name "Yvonne."

 Physical evidence included three footprints on Garza's door which appeared to have
been made by a tennis shoe. SAPD Detective Myron Oberheu measured one of the
footprints at approximately twelve inches. He measured the appellant's foot in court at
twelve and one-fourth inches. Two spent shell casings and one bullet were recovered from
Garza's apartment. The shell casings were ".380 auto caliber." They were two different
brands but appeared to have been fired from the same firearm. The bullet was consistent
with ".380 auto caliber."

 State's witness Frank Trujillo testified that he used to work at the front desk of the
West Point Inn in San Antonio and he was familiar with the appellant because he had come
to the motel on a couple of occasions asking for a room. Trujillo was not sure of the exact
date, but, a few days before April 13, 2000, the appellant asked for a room at the motel. He
also asked Trujillo if he wanted to buy a gun. When Trujillo asked him why, he said, "I had
to smoke a nigger." Trujillo noticed that the appellant was wearing a ring with "a tiger or
lion with red eyes." 

 Trujillo was arrested on a parole warrant on April 13 and was in jail at the same time
as the appellant. While in jail, the appellant told him that he, his brother, and his brother's
girlfriend went over to some guy's house to "jack him" for drugs and he kicked the door in
and shot the guy. He talked about taking some jewelry and said he was on camera at the
pawn shop trying to pawn the jewelry.

 Defense witness Ronald Marshall testified that he was friends with both Garza and
the appellant. Marshall testified that he was wearing Garza's gold chain and religious
pendant in a photograph that was recovered from Garza's apartment. Garza and the appellant
were also in the photograph that Marshall believed was taken in February or March of 2000. 
Marshall testified that Garza originally owned the pendant, but he had given it to the
appellant. The appellant let Marshall wear the pendant in the picture and he gave it back to
the appellant afterwards. While wearing the pendant, he observed that the links in the chain
of the necklace were broken and held together by wire.

 Marshall had never seen the appellant wearing the lion's-head ring. Marshall was
present when Garza got into an altercation at the strawberry festival the day before his
murder. At that time, Garza was wearing the gold nugget bracelet, but he was not wearing
the lion's-head ring or religious pendant.

II. Legal Sufficiency of the Evidence


 In his third point of error, the appellant challenges the legal sufficiency of the
evidence of guilt. (6) In order to convict the appellant of capital murder, the charge required
the jury to find beyond a reasonable doubt that the appellant intentionally committed
murder in the course of committing or attempting to commit robbery or burglary. The
appellant specifically alleges that the State failed to prove that he committed the underlying
offenses.

 In evaluating the legal sufficiency of the evidence, we must view the evidence in the
light most favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. (7) When the
trial court's charge authorized the jury to convict on alternative theories, as it did in this
case, the verdict of guilt will be upheld if the evidence was sufficient on any one of the
theories. (8)

 A person commits the offense of robbery if, in the course of committing theft and
with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or
recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens

or places another in fear of imminent bodily injury or death. (9) Theft is defined as the
unlawful appropriation of property with the intent to deprive the owner of the property. (10) 

 The appellant argues that the State failed to prove that he robbed Garza, pointing out
that the jewelry at issue was common and there was a possibility that Garza gave him the
jewelry. Mayberry testified that when the appellant came back to their car on their first trip
to the Stepping Stone Apartments, he was wearing a gold herringbone necklace, a gold
"broke rope" necklace, a gold religious pendant, and a gold lion's-head ring with rubies in
its eyes and a diamond in its mouth. Mayberry had not seen the appellant wearing the
lion's-head ring before. Hoyle testified that when she saw the appellant at 10:00 p.m. on
April 9, he was wearing a gold nugget bracelet and an "animal ring" with red rubies that she
had not seen him wearing before. Marshall testified that he had not seen the appellant
wearing a lion's-head ring before. A Treasures jewelry store employee testified that the
placement of the stones in the lion's-head ring was distinctive. Also distinctive was the fact
that the gold rope necklace was broken and held together with wire. 

 The appellant also contends that no witnesses "could place the allegedly stolen
jewelry on [Garza] on the day of his death." However, Estrada testified that she was with
Garza at the apartment complex on the day of the murder and he was wearing a gold chain
with a religious pendant, a lion ring with ruby eyes, and a gold nugget bracelet. Garza was
not wearing any jewelry when the police and paramedics arrived at his apartment. The
appellant pawned a gold herringbone chain, a gold rope necklace with a broken chain, and a
religious pendant that evening. The appellant was wearing a gold nugget bracelet and a
lion's-head ring when he was arrested on April 13. The jewelry was missing when Yvonne
cleaned out Garza's apartment a week after his death.

 Trujillo testified that the appellant told him he took some jewelry from the "guy" he
shot. The evidence also showed that the appellant took money from Garza. Mayberry told
police in her statement that the appellant said he took one hundred dollars when he returned
to Garza's apartment. (11)

 The evidence, viewed in the light most favorable to the verdict, established that the
appellant intentionally killed Garza while in the course of entering Garza's apartment,
without Garza's consent, with the intent to commit theft. Based on the evidence at trial, a
rational jury could have concluded beyond a reasonable doubt that the appellant
intentionally committed murder in the course of committing burglary. (12) We overrule the
appellant's third point of error.

III. Factual Sufficiency of the Evidence


 In his fourth point of error, the appellant generally challenges the factual sufficiency
of the evidence during the guilt phase of the trial. In a factual sufficiency review, we view
all the evidence in a neutral light and set aside the verdict only if (1) the evidence was too
weak to support a finding of guilt beyond a reasonable doubt or (2) if the contrary evidence
was so strong that the evidence in favor of the verdict could not have established guilt
beyond a reasonable doubt. (13)

 The evidence adduced during the guilt phase of the trial is outlined above. The
evidence established that the appellant kicked in the door of Garza's apartment with the
intent to commit a theft, shot Garza twice, and stole Garza's jewelry. The evidence that
supports this conclusion includes (1) the statements that Mayberry and Blanton gave to
police, (14) (2) the testimony that Garza had been wearing his jewelry just before the murder
but was not wearing any jewelry when the paramedics found him, and (3) the testimony
identifying the jewelry that the appellant pawned as Garza's jewelry. This evidence was not
too weak to support the jury's verdict that he committed murder while in the course of
burglary. (15)

 The evidence that undermines the verdict includes the trial testimony of Mayberry, 
Blanton, and Marshall. Mayberry and Blanton testified that Roberts threatened them with
capital murder charges if they did not give a statement implicating the appellant. At trial
they claimed that the appellant did not enter Garza's apartment and the appellant never said
that he had entered the apartment. Blanton also claimed that he had seen the appellant with
the lion ring before the day of the murder. Also, Marshall testified that he thought that
Garza gave the appellant the gold rope necklace and religious pendant.

 Marshall's testimony that Garza gave the gold rope necklace and religious pendant to
the appellant had been bolstered by the photograph of the appellant wearing the necklace
and pendant. But the testimony that Garza gave the necklace to the appellant instead of
lending the necklace to the appellant was undermined by Estrada's testimony that Garza had
been wearing this same necklace and pendant a short time before he was killed.

 The jury was free to reject any part of or all the testimony of these witnesses. We
cannot say that the evidence contrary to the verdict was so strong that the jury's verdict was
clearly wrong or unjust. (16) We overrule the appellant's fourth point of error. 

IV. Batson Claims


 In his first point of error, the appellant contends that the trial court erred in
overruling his Batson objections to the State's peremptory challenges of prospective jurors
Michelle Johnson and Ann Henderson. (17) A defendant objecting under Batson must make a
prima facie showing of racial discrimination in the State's exercise of its peremptory
strikes. (18) The burden then shifts to the State to articulate race-neutral explanations for its
strikes. (19) Once the prosecutor has articulated race-neutral explanations, the burden shifts
back to the defendant to show that the explanations are really a pretext for discrimination. (20) 
The trial court must then determine whether the defendant has carried his burden of proving
discrimination. (21) The trial court's determination is accorded great deference and will not
be overturned on appeal unless it is clearly erroneous. (22)

A. Johnson


 The appellant objected to the State's peremptory strike against Johnson under
Batson, the trial court made a finding that the appellant had made a prima facie case, and
the State articulated the reasons for its strike. The prosecutor explained that she struck
Johnson because she stated that the death penalty was against her religious beliefs, she was
confused about the death penalty, she believed that capital punishment was appropriate only
for premeditated cases, and she would hold the State to a higher standard of proof because
"she would have to be convinced without any doubt whatsoever" in order to return a guilty
verdict. The appellant argued in response that the questions that the prosecutor asked
Johnson were not race-neutral and were specifically designed "to try to knock her off this
jury." The trial court denied the Batson challenge.

 The appellant engages in a comparative analysis on appeal to show that the State's
reasons for striking Johnson were actually a pretext for discrimination. He compares the
State's questioning of Johnson to its questioning of prospective jurors Karen Albert,
Richard Rosas, Joe Ann Dobrick, Ada Bohlken, and Deborah Parker. All of these
prospective jurors stated that they could return a verdict of death if warranted by the
evidence and that they could follow the beyond a reasonable doubt standard of proof. In
contrast, Johnson told the prosecutor that "God is the only one" who should be able to take
someone's life and that in order to return a guilty verdict she would have to "believe
entirely" "without any doubts whatsoever" that the person committed the crime. 

 The appellant claims that the prosecutor spent more time explaining the law and
alleviating confusion with other prospective jurors. The State responds that it spent more
time with prospective jurors who clearly said that they could return a verdict of death
because these were people who would appear to make good jurors in a capital case. 

 The appellant also complains that Johnson was struck due to her views on
premeditation, while Rosas, Dobrick, Bohlken, and Parker were not. None of these
prospective jurors expressed that the death penalty should be reserved for only
premeditated crimes, as Johnson did; instead, they said that premeditation might be a factor
to consider in their decision-making process.

 The appellant points out that, after questioning by defense counsel, Johnson stated
that she could answer the questions to result in a death sentence based on the evidence, that
she would not require premeditation, and that she would not hold the State to a higher
burden than beyond a reasonable doubt. But the fact that a prospective juror vacillates about
her ability to choose the death penalty, despite personal beliefs, is a valid and neutral reason
to strike that person. (23)

B. Henderson


 We next turn to the appellant's Batson challenge to the State's peremptory strike
against Henderson. Without making a finding that the appellant had made a prima facie
case, (24) the trial court entertained the State's explanations for the strike. The prosecutor
explained that she struck Henderson because Henderson admitted that she had a bias against
the district attorney's office, she lied on her juror questionnaire about her prior arrests, her
son had a lengthy criminal history, she stated that she could not sentence someone to death,
she stated that "based on her job she would not be able to give his case her full attention,"
and she stated that she would have to be "convinced 100 percent" in order to convict a
person of a crime. The trial court denied the appellant's Batson challenge. 

 The appellant claims that the trial court failed to perform a complete Batson
analysis with regard to Henderson because it made no ultimate ruling on the third step of
the Batson analysis. The appellant complains that the trial court stopped the analysis after
determining that the State's proffered reasons were race-neutral. During the hearing,
however, the appellant did not attempt to rebut the State's reasons for striking Henderson. 
The trial court's ruling was apparent from the context and is supported by the record. (25)

 The appellant also argues that, upon further questioning by defense counsel,
Henderson stated that she could put aside her personal beliefs about the death penalty and
make a decision based on the evidence. Henderson's vacillation as to whether or not she
could impose the death penalty despite her personal beliefs is a valid and neutral reason for
a peremptory strike. (26) 

 The appellant says that one reason Henderson was struck was due to her son's
criminal activities, while prospective juror Ada Bohlken was seated on the jury despite
having a brother and a cousin with criminal histories. Bohlken said that her relatives were
treated fairly and it would not be a factor in her thought process at all. Henderson, on the
other hand, said that her son had not been treated fairly by the system and that she had a bias
against the district attorney's office. 

 The appellant also complains that Henderson was struck due to her own criminal
history, while prospective jurors Troy Hanson and Joy Carr were not. Henderson failed to
disclose her prior arrests in her jury questionnaire; Hanson and Carr were forthcoming
about their prior arrests and convictions. 

 The State's explanations for striking Johnson and Henderson were facially
race-neutral and the record shows no evidence of pretext. The trial court did not abuse its
discretion in denying the appellant's Batson challenges. We overrule the appellant's first
point of error.

V. Lesser-Included Offense Instructions


 The appellant asserts in his second point of error that the trial court erroneously
refused to instruct the jury on the lesser-included offenses of murder, felony murder,
criminal trespass, and criminal mischief. The appellant, however, requested that the trial
court instruct the jury only on the lesser-included offense of murder. He failed to preserve
the rest of his claim for appellate review because he did not request the trial court to
instruct the jury on felony murder, criminal trespass, and criminal mischief, nor did he
object to the omission of these issues from the charge. (27)

 We use a two-pronged test to determine whether a defendant is entitled to an
instruction on a lesser-included offense. (28) The first step in our analysis is to determine if
the lesser offense, murder, is included within the proof necessary to establish the offense
charged, capital murder. (29) Here, the first prong of the test has been satisfied because we
have held that murder is a lesser-included offense of capital murder. (30)

 The second step requires an evaluation of the evidence to determine whether there is
some evidence that would permit a jury rationally to find that the defendant is guilty only
of murder. (31) The evidence must establish murder as a valid rational alternative to capital
murder. (32) We are not concerned with whether this evidence is strong, credible, or
uncontroverted. (33) If some evidence exists, from whatever source, the appellant is entitled
to the instruction upon request. (34)

 The appellant argues that the murder was not committed in the course of another
felony because the State failed to prove the underlying offenses of robbery or burglary. 
The appellant asserts that there was no evidence besides "speculation" that anything was
taken from Garza's apartment. The appellant contends that the evidence instead shows that
the jewelry, which was "not unique and could be purchased anywhere," actually belonged to
the appellant.

 We disagree with the appellant's claim that there was no evidence, besides
speculation, that anything was taken from the apartment. As we discussed above, the
evidence is both legally and factually sufficient to support the jury's verdict. The question
is whether there is some evidence in the record from which a rational jury could conclude
that, if the appellant was guilty, he was guilty only of murder.

 We will review the evidence that tends to establish that the appellant did not commit
burglary or robbery. Blanton testified that the appellant knocked on Garza's door but did
not actually enter Garza's apartment. He also denied that the appellant bragged about having
killed Garza. Blanton also said that he had seen the appellant wearing a lion's-head ring
before the day of Garza's murder. Mayberry testified that the appellant knocked on
Garza's door, but she did not see him enter the apartment. Marshall testified that Garza
gave his gold rope chain and religious pendant to the appellant. Photographs introduced
during the trial depicted the appellant wearing jewelry that was similar to Garza's religious
pendant and gold nugget bracelet.

 The evidence that suggests that the appellant did not commit burglary or robbery
also suggests that the appellant did not commit murder. If the jury believed Blanton's and
Mayberry's testimony, the appellant was guilty of nothing more than knocking on a friend's
apartment door. If the jury believed Marshall, then the appellant merely accepted a gift
from Garza. And the photographs do not show the appellant killing Garza. The record
contains no evidence from which the jury could conclude that, if the appellant was guilty,
he was guilty only of murder. We overrule the appellant's second point. 

VI. Improper Impeachment


 In the appellant's fifth point of error, he claims that the trial court allowed the State
to improperly impeach Mayberry and Blanton by reading their statements to the jury in
violation of Texas Rule of Evidence 613. (35) The appellant specifically argues that "the State,
though admonished by the trial court on several occasions to . . . comply, not only read the
statements to the jury, but had the Detective who took the statements repeat the process." 
The appellant did not object on this basis when Roberts testified regarding Mayberry and
Blanton's statements; thus, this portion of his claim was not preserved for appeal. (36)

 Rule 613(a) permits a party to impeach a witness with a prior inconsistent
statement. Before a witness may be impeached with a prior inconsistent statement, the
witness must be told the contents of the statement and the time and place and the person to
whom it was made, and must be afforded an opportunity to explain or deny such statement. (37) 
If the witness denies making the contradictory statement, then it may be proved by the prior
inconsistent statement. (38) If the witness admits the prior inconsistent statement, however,
the prior statement is not admissible. (39) If the witness admits making the written statement
but upon inquiry denies portions of the statement, then the portion that contradicts the
witness may be proved for purposes of impeachment. (40)

 Before questioning Mayberry about her statement to Roberts, the prosecutor
showed her the statement and asked her if it was the statement that she gave to police on
April 11, 2000. Mayberry acknowledged that it was her statement. Upon further
questioning, however, Mayberry testified that the contents of the statement were not true,
that Roberts was putting words in her mouth, and that she signed the statement only because
she was told that she would be charged with capital murder if she did not do so.

 Before questioning Blanton about his statement, the prosecutor showed him the
statement and asked him if it was the statement he gave to Roberts on April 11, 2000, at
11:35 p.m. at 214 West Nueva. Blanton testified that the portions of his statement
pertaining to Garza's murder were untrue, that the majority of his statement was based on
what Roberts told him, and that he signed the statement only because he feared that he
would be charged with capital murder and he wanted the police to let him and Mayberry go
home. 

 The prosecutor did not read the statements to the jury as the appellant suggests
during the cross-examination of Mayberry or Blanton. (41) Instead, the prosecutor questioned
Mayberry and Blanton about their prior inconsistent statements for impeachment purposes,
consistent with Rule 613. The trial court did not abuse its discretion. We overrule the
appellant's fifth point of error.

VII. Jury Argument

 In his sixth point of error, the appellant complains that the prosecutor improperly
attacked him over the shoulders of defense counsel. He contends that the prosecutor's
argument violated his rights under the Sixth and Fourteenth Amendments to the United
States Constitution and Article I, §§ 9 and 10 of the Texas Constitution. 

 On the first day of trial, Mayberry testified that, after leaving Garza's apartment
complex, she saw that the appellant had something "shiny" that looked like a gun and he told
her it was either a ".380" or a ".38." The next day, defense counsel elicited from Mayberry
that she spoke with him following the conclusion of the first day of trial. Mayberry
changed her trial testimony and stated that she never saw the appellant with a gun and that
she lied the day before when she testified that she had. During closing argument, the
prosecutor referred to Mayberry's change in testimony and the following exchange
occurred:

[PROSECUTOR]: [Mayberry] also said - - in her statement she told you that
the first day while she was testifying on Monday that I glanced and I saw a
gun. I glanced - - yes, I saw - - I glanced and I saw it. And I asked the
Defendant what it was and he said it's either a .38 or a .380. Then she has the
opportunity, she and [Blanton], to go visit with the defense attorneys and the
next day, surprisingly enough, she gets on the witness stand.


[DEFENSE COUNSEL]: I'm going to object.


[PROSECUTOR]: And said I lied.


[DEFENSE COUNSEL]: We're entitled to talk to witnesses just like the
State is. I mean I'm - - I've heard this over and over. There's nothing wrong
with the defense attorneys talking to witnesses.


THE COURT: Overruled.


 The prosecutor then continued her argument. The appellant complains only about
the following statement:

[PROSECUTOR]: After visiting with the defense attorneys, the next day she
comes in here and she says I didn't see a gun. I didn't see a gun. If it ain't
here in black and white, Mayberry didn't say it. Well, you heard her, I asked
her time after time. Three or four times about the gun on Monday and she
told you she saw it.


The appellant argues that the prosecutor improperly attacked the appellant over the
shoulders of defense counsel during this portion of her closing argument by implying that
defense counsel manipulated Mayberry into changing her trial testimony. The appellant did
not object to this portion of the prosecutor's argument, which is the sole basis for his
challenge on appeal. The appellant objected to the prosecutor's prior statement, which he
does not challenge here. As a result, his objection made during the trial does not comport
with his complaint on appeal. The appellant has failed to preserve his complaint for our
review. (42) Point of error six is overruled.

VIII. Conclusion


 Having found no reversible error in the record, we affirm the trial court's judgment.

Delivered: June 30, 2004.


Do Not Publish.


1. Tex. Pen. Code § 19.03(a).
2. Tex. Code Crim. Proc. Art. 37.071, § 2(g).
3. Batson v. Kentucky, 476 U.S. 79, 89 (1986).
4. By the time the appellant's trial began, Mayberry had married Robert Blanton. For purposes
of this opinion, we will refer to Robert Blanton as Blanton and Latoya Mayberry as Mayberry.
5. The pawn shop video showed that Blanton and Mayberry were outside the car but not inside
the store.
6. The appellant also contends that Section 19.02(a)(2) of the Texas Penal Code is
unconstitutional as applied to him because the State "used the murder to transform the appellant's illegal
entry of the habitation into a burglary and then used the same murder coupled with the burglary to
establish the offense of capital murder." The appellant's claim is factually incorrect. The State charged
the appellant with murder in the course of committing burglary with intent to commit theft. Even if such
bootstrapping claims had not been rejected by this Court, see Homan v. State, 19 S.W.3d 847, 849
(Tex. Crim. App. 2000), the appellant's claim would still fail.
7. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).
8. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999) (citing Rabbani v. State, 847
S.W.2d 555, 558-559 (Tex. Crim. App.1992)). 
9. Tex. Pen. Code § 29.02.
10. Tex. Pen. Code § 31.03(a).
11. During Mayberry's testimony, portions of her statement came in only as impeachment
evidence. During Roberts's testimony, however, the statement was read without objection. As a
result, the statement was substantive evidence of guilt. See Tex. R. Evid. 802 ("Hearsay is not
admissible except as provided by statute or these rules or by other rules prescribed pursuant to
statutory authority. Inadmissible hearsay admitted without objection shall not be denied probative value
merely because it is hearsay").
12. Jackson, 443 U.S. at 319.
13. Zuniga v. State, No. 539-02, slip op. at 14, 2004 Tex. Crim. App. LEXIS 668 (Tex. Crim.
App., delivered April 21, 2004).
14. During Blanton's testimony, portions of his statement came in only as impeachment evidence. 
During Roberts's testimony, however, the statement was read without objection. As a result, the
statements became substantive evidence of guilt. See Tex. R. Evid. 802 ("Hearsay is not admissible
except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority.
Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is
hearsay").
15. Ibid.
16. See Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).
17. See Batson v. Kentucky, 476 U.S. 79, 89 (1986) (holding that "the Equal Protection Clause
forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption
that black jurors as a group will be unable impartially to consider the State's case against a black
defendant") The appellant also argues in a footnote that the trial court erred in refusing "to conduct a
Batson analysis with regard to the jury shuffle." The only legal authority he presents in support of this
claim is a citation to a footnote to Ladd v. State, 3 S.W.3d 547 (Tex. Crim. App. 1999), in which we
noted that one scholar argued in a law review article that Batson should extend to jury shuffles. Id., at
575 n.9. The appellant omitted the remainder of the footnote where we stated: "We wish to make it
clear, however, that we do not endorse such a view." Ibid.
18. See Herron v. State, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002).
19. Ibid.
20. Ibid.
21. Ibid.
22. Ibid.
23. Jasper v. State, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001).
24. Once the responding party has offered a race-neutral explanation for the peremptory
challenge and the trial court has ruled on the ultimate question of purposeful discrimination, the
preliminary issue of whether the objecting party made a prima facie case becomes moot. Malone v.
State, 919 S.W.2d 410, 412 (Tex. Crim. App. 1996).
25. See Simpson v. State, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003).
26. Jasper, 61 S.W.3d at 422.
27. Tex. Code Crim. Proc. Art. 36.14; Posey v. State, 966 S.W.2d 57, 61 (Tex. Crim. App.
1998) (holding that the trial court has no duty to instruct sua sponte the jurors on defensive issues, even
under Code of Criminal Procedure Article 36.19 and Almanza v. State, 686 S.W.2d 157 (Tex. Crim.
App. 1984) (op. on reh'g)).
28. Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).
29. Ibid.
30. Jones v. State, 833 S.W.2d 118, 127 (Tex. Crim. App. 1992).
31. Rousseau, 855 S.W.2d at 672.
32. Wesbrook v. State, 29 S.W.3d 103, 113-14 (Tex. Crim. App. 2000).
33. Rousseau, 855 S.W.2d at 672.
34. Ibid.
35. The appellant also claims the State's improper impeachment of Mayberry and Blanton
violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and
Article I, §§ 9 and 10 of the Texas Constitution. Because the appellant does not provide separate
authority or argument for his constitutional claims, we decline to address them. See Heitman v. State,
815 S.W.2d 681, 690-91 n.23 (Tex. Crim. App. 1991). 
36. Tex. R. App. P. 33.1.
37. Tex. R. Evid. 613(a). The appellant argues that the State failed to establish "surprise" or
"injury" before impeaching Mayberry and Blanton. This showing is no longer required. Tex. R. Evid.
607; Hughes v. State, 4 S.W.3d 1, 5 (Tex. Crim. App. 1999); Barley v. State, 906 S.W.2d 27, 40
n.11 (Tex. Crim. App. 1995) 607. 
38. See McGary v. State, 750 S.W.2d 782, 786 (Tex. Crim. App. 1988).
39. Ibid.
40. Id. at 787.
41. Later in the trial, these statements were read to the jury without objection during Roberts's
testimony. 
42. Tex. R. App. P. 33.1.